**FILED**

NOV **1 3** 2014

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY=~~~~~~~, DEPUTY

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) |
| | ) |
| DOUGLAS G. WILLIAMS, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

No. **CR 14-318 M**

Violations:   18 U.S.C. § 1341
18 U.S.C. § 1512(b)(1)
18 U.S.C. § 1512(b)(3)
18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

## INDICTMENT

The Federal Grand Jury charges:

### Introduction

At all times relevant to this Indictment:

1.     Defendant **DOUGLAS G. WILLIAMS ("WILLIAMS")** was a former Oklahoma City, Oklahoma, law enforcement officer. **WILLIAMS** owned and operated an Internet-based business he called "Polygraph.com." **WILLIAMS** was hired and paid to train customers how to conceal misconduct and other disqualifying information during Federal employment suitability assessments, Federal security background investigations, internal Federal agency investigations, and other proceedings. **WILLIAMS** instructed his customers to lie and deny meeting **WILLIAMS**, talking to **WILLIAMS**, and receiving **WILLIAMS'** training.

2.     **WILLIAMS'** principal place of business was Norman, Oklahoma, where **WILLIAMS** planned, operated, and managed his business from his home. **WILLIAMS**

1

listed an e-mail address, a telephone number, and a post office box mailing address on his

website. **WILLIAMS** received inquires, orders, and requests for his training by

telephone, e-mail, and regular mail.

3.    **WILLIAMS** marketed his services to persons appearing before Federal

law enforcement agencies, Federal intelligence agencies, state and local law enforcement

agencies, and for other purposes, including, as stated on **WILLIAMS'** website:

> all local, state and federal positions, such as, DHS, FBI, Secret
> Service, CIA, NSA, DOD, DHS, CBP, Police, Sheriff, State Police,
> Highway Patrol, Firefighter, RCMP, as well as periodic, criminal,
> maintenance, post-conviction testing (PCSOT), parole and
> probation, specific issue, full scope, life style, sporting, and
> spouse/partner fidelity.

4.    **WILLIAMS** conducted private, in-person training both in a rented office

space in Norman, Oklahoma, and at various locations selected by customers.

**WILLIAMS** charged at least $1,000 for training conducted in Norman, Oklahoma.

**WILLIAMS** charged at least $5,000, plus expenses, to conduct training at a location

specified by a customer. Appointments for in-person training could be made by

telephone or e-mail.

5.    The Department of Homeland Security ("DHS") was an executive

department of the United States government. Among other responsibilities, DHS was

charged with administering and enforcing the customs laws of the United States. DHS

was authorized by law to conduct and supervise investigations relating to the programs

and operations of the agency. United States Customs and Border Protection ("CBP") was

a Federal law enforcement agency of DHS authorized by law to enforce U.S. regulations

regarding immigration, international trade, customs, and drugs. CBP's primary mission was to prevent terrorists and terrorist weapons from entering the United States and ensuring the security of America's borders and ports of entry.

6.     The United States Office of Personnel Management ("OPM") was authorized by law to conduct suitability investigations and make determinations regarding suitability for employment in the U.S. government competitive service for certain job applicants, including applicants for CBP law enforcement positions. OPM lawfully delegated authority to CBP to conduct suitability determinations and security background investigations for CBP employees, including by conducting pre-employment polygraph examinations for law enforcement applicants. In making the determination regarding suitability for employment, OPM and CBP considered, among other things, an applicant's history of misconduct or negligence in employment; criminal or dishonest conduct; material, intentionally false statements, deception, or fraud in examination or appointment; illegal use of narcotics, drugs, or other controlled substances; any statutory or regulatory bar preventing the lawful employment of the applicant; and the nature, seriousness, circumstances, recency, and applicant's age at the time of any such conduct.

**COUNTS ONE-TWO**
(Mail Fraud, 18 U.S.C. § 1341)

7.     The Federal Grand Jury incorporates paragraphs 1-7 by reference.

A. The Scheme to Defraud

8.     From in or around September 2012 through in or around October 2012, in the Western District of Oklahoma and elsewhere, defendant

-------------------------------DOUGLAS G. WILLIAMS-------------------------------

did knowingly devise and intend to devise a scheme and artifice to defraud the Federal government, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

B. The Purpose of the Scheme and Artifice to Defraud

9.     The purpose of the scheme was to defraud the United States and to obtain and maintain positions of Federal employment for **WILLIAMS'** customers for which they did not qualify, and the salary attendant to such positions, through materially false and fraudulent statements and representations.

10.     A further purpose of the scheme was for **WILLIAMS** to enrich himself by assisting his customers – including, among others, Federal job applicants, applicants for Federal security clearances, and individuals under investigation by Federal law enforcement agencies – in deceiving the Federal government in order to obtain or maintain positions of Federal employment for which **WILLIAMS'** customers did not qualify.

4

C.  The Manner and Means of the Scheme

11.    **WILLIAMS**, through his website, offered to provide private, in-person training either by traveling to a customer or by providing the training at **WILLIAMS'** rented office in Norman, Oklahoma.

12.    **WILLIAMS** charged and received approximately $1,000 to $5,000, plus travel expenses, if any, to train customers how to conceal material lies and false statements and disqualifying conduct during proceedings before Federal agencies.

13.    During his trainings, **WILLIAMS** instructed customers regarding specific statements to make, as well as specific facts to admit, conceal, or deny, during proceedings before Federal agencies.

14.    To aid the concealment of his customers' false statements and disqualifying conduct, and to help his customers obtain or maintain Federal employment fraudulently, **WILLIAMS** instructed his customers to lie about their prior conduct and to deny receiving training from **WILLIAMS**.

D.  Acts in Furtherance of the Scheme to Defraud

15.    In furtherance of the scheme to defraud, **WILLIAMS** committed and caused to be committed the following acts, among others, in the Western District of Oklahoma and elsewhere:

16.    On or about September 25, 2012, a special agent in CBP's Office of Internal Affairs ("CBP IA") placed a telephone call to **WILLIAMS** at the telephone number listed on **WILLIAMS'** website, which connected to **WILLIAMS'** personal cellular

5

telephone, and spoke with **WILLIAMS**. The agent told **WILLIAMS** that he (the agent) was in the hiring process with DHS but had intentionally omitted information on employment application and background investigation forms. In response, **WILLIAMS** told the agent that he (the agent) was wise to omit information from the forms that would disqualify him (the agent) from employment by DHS. **WILLIAMS** told the agent that he (the agent) could tell DHS whatever he (the agent) wanted to tell DHS if the agent followed the training that he received training from **WILLIAMS**.

### First Undercover Operation

17.    On or about October 15, 2012, Undercover A placed a telephone call to **WILLIAMS** at the telephone number listed on **WILLIAMS'** website, which connected to **WILLIAMS'** personal cellular telephone, and spoke with **WILLIAMS**. Undercover A told **WILLIAMS** that he (Undercover A) was an inspector at an airport and was under investigation for allowing a friend to pass through customs with contraband. **WILLIAMS** told Undercover A that he would help Undercover A "get prepared" for the investigation and that they would "be thorough about it." **WILLIAMS** agreed to fly to Alexandria, Virginia, to provide private, in-person training to Undercover A at a hotel near Reagan-National Airport. **WILLIAMS** promised to assist Undercover A to "get ready" and told Undercover A "there's not gonna be one problem at all."

18.    During a subsequent telephone call on or about October 15, Undercover A told **WILLIAMS** that the investigation was by DHS. **WILLIAMS** claimed to be the "only person in the world" who could provide the necessary training. **WILLIAMS** told Undercover A that "now every person who's convicted of any type of sexual offense in

6

the United States has to take a polygraph test every six months to stay out of jail, so they're willing to you know, line up three deep to get trained to make sure they can pass the damn thing." **WILLIAMS** told Undercover A, "I've given just thousands and thousands of interrogations," and, "We can get you ready."

19.    On or about October 17, 2012, by e-mail message, Undercover A informed **WILLIAMS** that Undercover A intended to lie to investigators about his involvement in illegal smuggling and that, if the investigators learned the truth, Undercover A would likely be fired and prosecuted. During a telephone call that followed, **WILLIAMS** chastised Undercover A, saying:

> I told you I'm assisting you under the assumption that you are telling the truth, then you turn right around and say, "Yeah, just like I told you, I'm lying and I can't – and just like I told ya I'm lying." What the fuck do you think you're doing dumbass? Do you think you have, do you think you have like a lawyer confidentiality with me?

**WILLIAMS** continued, "And you should be smart enough to know that you don't go around blabbing to everybody that you're lying your ass off. You don't dare tell DHS that, or they'll throw you in jail." **WILLIAMS** told Undercover A, "I haven't lived this long and fucked the government this long, and done such a controversial thing that I do for this long, and got away with it without any trouble whatsoever, by being a dumbass."

20.    During the conversation, **WILLIAMS** told Undercover A that he **(WILLIAMS)** was "worried about whether I can trust you, number one, to be smart enough to keep your damn mouth shut after I've already told you to." **WILLIAMS** then said, "I don't wanna know anything. You've already told me way more than I wanted to know in the first place." **WILLIAMS** then threatened not to conduct the training for

Undercover A, stating, "I don't know if you've got sense enough to keep your damn mouth shut."

21.    **WILLIAMS** devised a plan to conceal evidence of his knowledge of Undercover A's intent to lie to DHS investigators, instructing Undercover A to "[c]hange your name, change your telephone number, don't tell me anything about anything and come bring your ass down to see me ... and don't even tell me the details of it and we'll run through something like that maybe." **WILLIAMS** then backtracked, stating:

> It's already on a record though, so you've already told me two or three times, you already told me on the telephone and then you repeated in an e-mail that you had told me on the telephone. . . . I can't, I can't tell you what I have told you on the telephone and go into detail about how they will throw you in jail and how to lie to the DHS and all, I mean, good God son!

**WILLIAMS** told Undercover A to "save money for a lawyer." **WILLIAMS** said, "knowing what I know now I can't, see? Since you've already... Since you've already told me and then reiterated it and everything else, you got me too paranoid. You got me too paranoid."

22.    After Undercover A asked if there was any way **WILLIAMS** would train him, **WILLIAMS** stated:

> I tell you: "Look, just, I'm working under the assumption that you're telling the truth." See, that protects me. That way I am just teaching an honest, truthful person ... You don't have to turn around and say, "Yeah, like I told you, I'm a lying son of a bitch." What the fuck was the reason for that, unless you wanted it on record that I was knowingly teaching someone how to lie and cheat...?

**WILLIAMS** said, "I can't think of any reason to change my mind but I'll sleep on it and talk to my wife about it."

23.     Two hours later, **WILLIAMS** and Undercover A spoke on the telephone again. **WILLIAMS** told Undercover A:

> Look at your e-mail. I've come up with a new plan. We're gonna just start fresh. Okay? And here's what we're gonna do. You're gonna e-mail me back at "the paranoid chicken." When you check your e-mail, you'll see that there's an e-mail from "the paranoid chicken." And that says that if I get an e-mail from someone I don't know, and a telephone call from a number I don't know, and they use a name that I don't know, and they just tell me they're gonna tell the truth and they're just nervous . . . then I can work with a person like that.

**WILLIAMS** further instructed Undercover A to "dump this number and get a new number and then dump your old e-mail and get a new e-mail and then we'll go from there."

24.     Several hours later, **WILLIAMS** left a voice-mail for Undercover A stating, "don't worry about changing telephone numbers," and directing Undercover A to call back. When Undercover A returned the telephone call, **WILLIAMS** said:

> Yeah, don't worry about all that shit. . . . Here's what we're gonna do: Instead of leaving a paper trail, we're not gonna leave any paper trail. Instead of a cashier's check, we're gonna use money orders. You can get money orders at the post office when you send an Express Mail, all right?

**WILLIAMS** told Undercover A to send a $4,500 money order – $2,000 for **WILLIAMS'** plane tickets and $2,500 for half of **WILLIAMS'** fee – by U.S. Express Mail, to the same post office box address listed on **WILLIAMS'** website, and to provide by e-mail message the Express Mail tracking number associated with the payment. **WILLIAMS** further instructed Undercover A to bring an additional $2,500 in cash to the training.

25.     On or about October 19, 2012, Federal law enforcement officers sent a $4,500

cashier's check to **WILLIAMS** by U.S. Express Mail. On or about October 19, 2012, in

accordance with the instructions from **WILLIAMS**, Undercover A sent an e-mail message to

**WILLIAMS** listing the U.S. Express Mail tracking number that would allow **WILLIAMS** to

track the retainer fee on the U.S. Postal Service website. On or about October 20, 2012,

**WILLIAMS** sent an e-mail message to Undercover A confirming that he received the money

and bought the airline tickets.

26.    **WILLIAMS** thus agreed to train Undercover A despite knowing that

Undercover A intended to lie to investigators in order to avoid prosecution and to

maintain his employment as a DHS inspector at an airport. During their final

conversation occurring on or about October 17, 2013, **WILLIAMS** told Undercover A,

"You don't wanna have to pay for something stupid for the rest of your life, and we're

gonna make sure that you can get in there and . . . tell 'em whatever you wanna tell 'em."

27.    On or about October 27, 2012, **WILLIAMS** met Undercover A at a hotel

in Arlington, Virginia, for private, in-person training. **WILLIAMS** stated, "Now that

we're alone and private, tell me what this is all. . . First things first: You got my money?

We'll start off with the money." After Undercover A confirmed that he brought the

$2,500 balance, **WILLIAMS** said, "Count it out while I'm finishing getting set up and

we'll go from there." After watching Undercover A count out the money, **WILLIAMS**

said, "Tell me what this is all about," before questioning Undercover A about the DHS

investigation.

28.    In response, Undercover A told **WILLIAMS** that he (Undercover A)

helped an acquaintance smuggle narcotics through customs on four occasions in

10

exchange for $2,500 per occasion. Undercover A said, "I made a mistake, I mean, I shouldn't have done that," to which **WILLIAMS** responded, "Doesn't matter about that. I don't care if you did or whether you didn't do it. More power to you if you did."

**WILLIAMS** confirmed that Undercover A was under investigation by "your agency that you work for," and Undercover A reiterated that he worked for "Homeland Security."

**WILLIAMS** then proceeded to train Undercover A how to conceal material lies and false statements during investigation of his (Undercover A's) involvement in smuggling narcotics while employed as a DHS inspector at an airport.

29.     During the training, **WILLIAMS** instructed Undercover A, "do not change your story, do not tell upon yourself, and do not admit to ever seeing me or talking to me or anything else." **WILLIAMS** repeated these instructions later in the training, directing Undercover A to make material lies and misstatements during his meeting with Federal investigators:

> You just stick to your story: "I did not knowingly do anything. I did not know he had any narcotics on him. I didn't know any of that stuff." You stick to your story.

In addition, **WILLIAMS** specifically directed Undercover A to deny preparing for his meeting with Federal investigators:

> Now he's gonna say, "Have you ever done any research? You mean to tell me you didn't get on the internet and try to find out anything?" And, again, you just say, "No, I didn't. I thought all I had to do was come in here and tell the truth."

**WILLIAMS** further summarized how he wanted Undercover A to portray himself to Federal agents:

You are an honest man, truthful man, who has been wrongfully accused and you don't even know why you have been betrayed for some reason that you don't even know why, and you stick to that damn story, because if they had any proof they would have already come to get you.

At the end of the training, **WILLIAMS** told Undercover A, "The less communication we have, the better. And, again, don't ever mention to anybody that you've seen me."

### *Second Undercover Operation*

30.     On or about February 5, 2013, Undercover B placed a telephone call from Arlington, Virginia, to **WILLIAMS'** personal cellular telephone, at the number listed on **WILLIAMS'** website, and spoke with **WILLIAMS**. Undercover B told **WILLIAMS** that he (Undercover B) was applying for a job with the "Border Patrol." Undercover B told **WILLIAMS** that he (Undercover B) was employed by a county sheriff's office and emphasized that it was important that their conversation remain confidential. When Undercover B inquired about the costs of receiving in-person training in Oklahoma, and balked at the high cost, **WILLIAMS** responded by stating that it should be worth it to Undercover B to spend $1,000 in order to "get a job that starts off at sixty grand a year."

31.     During the conversation, Undercover B told **WILLIAMS** that he (Undercover B) was nervous for "a couple of reasons," but **WILLIAMS** interrupted Undercover B without allowing Undercover B to express the reasons for his nervousness. Later, on or about February 5, 2013, Undercover B called **WILLIAMS** a second time and identified himself as "the Border Patrol agent applicant who left stuff off his application forms." In addition, Undercover B again told **WILLIAMS** that he

(Undercover B) was a law enforcement officer from Virginia.

32.     On or about February 7, 2013, Undercover B spoke with **WILLIAMS** again by telephone. After identifying himself as "the Deputy Sheriff in Virginia" that called "a couple days ago," Undercover B told **WILLIAMS** that he (Undercover B) was worried about answering questions that CBP might ask related to sex and drugs. **WILLIAMS** stated, "Don't tell 'em anything, that'll disqualify you. Don't tell them anything embarrassing. Don't tell them anything negative." **WILLIAMS** told Undercover B, "I will get you ready. You can tell anything you want to tell, don't tell me anything that will disqualify you and I can train you how to pass if you're lying your ass off, so don't worry about that fucking bullshit." Undercover B asked **WILLIAMS** if he (Undercover B) should "bring my application forms that I basically lied on," and **WILLIAMS** interrupted Undercover B but answered the question, "No."

33.     **WILLIAMS** instructed Undercover B to send a $750 money order – which **WILLIAMS** characterized as a retainer fee – by U.S. Express Mail, to the same post office box address listed in **WILLIAMS'** training manual, and to provide by e-mail message the Express Mail tracking number associated with the payment. **WILLIAMS** further instructed Undercover B to bring an additional $250 in cash to the training.

34.     On or about February 12, 2013, in accordance with the instructions from **WILLIAMS**, Federal law enforcement officers sent a $750 money order to **WILLIAMS** by U.S. Express Mail. On February 12, 2013, also in accordance with the instructions from **WILLIAMS**, Undercover B sent an e-mail message to **WILLIAMS** listing the U.S. Express Mail tracking number that would allow **WILLIAMS** to track the retainer

fee on the U.S. Postal Service website. After receiving the $750 retainer payment from

Undercover B, **WILLIAMS** sent an e-mail message to Undercover B that included an

attached document titled, "Directions from Airport," and reminded Undercover B to bring

the remaining $250 in cash.

35.     On February 21, 2013, Undercover B met **WILLIAMS** at **WILLIAMS'**

rented office in Norman, Oklahoma, for private, in-person training. **WILLIAMS**

immediately stated, "Now, first things first, you got the rest of my price?" After

accepting $250 in cash from Undercover B, **WILLIAMS** said, "Okay, now, tell me what

this is all about," to which Undercover B responded, "Well, it's gonna be for the Border

Patrol." **WILLIAMS** interrupted:

> Oh, no problem, I've taught a lot of those guys. In fact, there's a lot
> of government agents – FBI, Secret Service, NSA, all of those
> alphabet agencies – that have already retired, that I taught, years ago.
> And I know what I'm doing and you will pass with no problem.

**WILLIAMS** told Undercover B, "We're gonna get you prepared."

36.     Undercover B tried to further explain his concerns but was interrupted by

**WILLIAMS**:

> Undercover B:  But Doug, I'm worried about two questions; I'm
>                worried about two questions...
>
> **WILLIAMS**:   We're not worried about any questions, all right? So
>                you just let me do my thing and you just let that little
>                "meat computer" absorb what I'm fixed to tell ya –
>
> Undercover B:  Okay, all right.
>
> **WILLIAMS**:   And then you don't worry about any fucking
>                questions.
>
> Undercover B:  Okay.

14

> **WILLIAMS**: It doesn't matter whether you're lying, whether you're telling the truth, whether you intend to lie, whether you don't know a lie from the truth or whether you're a psychopath or what, any of that shit, okay?

Undercover B: Uh huh, uh huh, understood.

> **WILLIAMS**: First thing, let me do the talking.

**WILLIAMS** told Undercover B, "It's impossible for you to fuck it up if you do what I tell you to do. Let me tell you what to do, okay? Quit interrupting me with all this negative bullshit, all right?"

37.     During the training, Undercover B said to **WILLIAMS**, "My big fear is them asking me about the drug question," at which time **WILLIAMS** interrupted again, saying, "Oh, God, please help me. Brian, shut the fuck up about worrying about stuff. Listen to me. . . . I was just getting to the solution to your fucking worries. . . . I've already told you three times, 'quit bringing up negative shit, because I'm fixing it to put it all positive, okay?" **WILLIAMS** added, "I don't give a damn if you're the biggest heroin dealer in the fucking United States."

38.     During the training, **WILLIAMS** told Undercover B that he (Undercover B) would have to think of scenarios that would cause him (Undercover B) to have a "fearful, nervous, scared-type reaction." Undercover B said, "I got two things. When I was a jailer, I smuggled cocaine into the jail for an inmate." **WILLIAMS** replied, "Let's don't think about that. What else? What's the other one?" Undercover B responded, "I had to go to the high school to pick up a student because she was involved in drugs, took her to the station, interviewed her, and on the way back we kind of messed around."

WILLIAMS responded, "Okay, we're not gonna think about that one either."

WILLIAMS explained, "We don't want to think about something that you're lying about, because we don't want you to even think about that, those questions." WILLIAMS told Undercover B, "I'm just wanting you not to think of something that's incriminating."

39.     Undercover B later asked WILLIAMS, "If I tell them that I sold drugs in the jail, when I was a jailer, can they use that against me? . . . I'm certainly not gonna tell them I got a blow job from a 14-year-old girl." WILLIAMS responded, "Keep that shit to yourself. I mean, why would you ever say something like that anyway? If you're gonna do that, save yourself the trouble, don't even go. If you're gonna sabotage your own damn self." WILLIAMS then said, "Why would you ever tell 'em sons of bitches anything that you don't want 'em to know?"

40.     After telling Undercover B not to admit anything that he (Undercover B) did not want the Federal government to know, WILLIAMS said, "A lot of times they'll say, 'You're having trouble with this drug question. You're having . . . There's something else you need to tell me Brian.' You just look at him and say, 'Sir, I have told you the absolute, complete truth.' ... You throw it right back on him. And you do not make any admissions whatsoever." Undercover B told WILLIAMS, "I just don't want Internal Affairs to open up a big investigation," and WILLIAMS responded, "We're not gonna worry about that because you're not going to have a reaction. I'm showing you, right now. You always get ahead of me. I can solve these problems."

41.     When Undercover B asked WILLIAMS what to do if asked if he (Undercover B) had received training, WILLIAMS told him to "look at them with an

astounded look on your face. . . . Reverse it on him." When Undercover B offered to send **WILLIAMS** some business, **WILLIAMS** said, "Wait until you're in before you tell anybody. I would wait until you know for sure you got the job before you tell anybody."

    E. Use of the Mails in Execution of the Scheme

    42.    On or about the date of each Count listed below, in the Western District of Oklahoma and elsewhere, defendant

--------------------------------DOUGLAS G. WILLIAMS------------------------------------

for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud the Federal government, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly place and cause to be placed, and deposit and cause to be deposited, in a post office and an authorized depository for mail, the following matters and things to be sent and delivered by the United States Postal Service and by private and commercial interstate carrier:

| COUNT | APPROXIMATE DATE OF MAILING | MATTER/MAILING TRANSMITTED |
|-------|-----------------------------|----------------------------|
| 1 | October 19, 2012 | Cashier's check in the amount of $4,500 sent from Alexandria, Virginia to the Western District of Oklahoma via United States Postal Service, Express Mail, addressed to "Doug Williams, P.O. Box 720568, Norman, Oklahoma, 73070" |
| 2 | February 12, 2013 | Money order in the amount of $750 sent from Alexandria, Virginia to the Western District of Oklahoma via United States Postal Service, Express Mail, addressed to "Doug Williams, P.O. Box 720568, Norman, Oklahoma, 73070" |

All in violation of Title 18, United States Code, Section 1341.

## COUNT THREE
(Witness Tampering, 18 U.S.C. § 1512(b)(1))

43.     The Federal Grand Jury incorporates paragraphs 1-41 by reference.

44.     In or around October 2012, in the Western District of Oklahoma and elsewhere, defendant

---------------------------------DOUGLAS G. WILLIAMS-----------------------------------

did knowingly and corruptly persuade and attempt to persuade Undercover A to conceal material facts and make false statements with the intent to influence, delay, and prevent the testimony of Undercover A in an official proceeding, namely an investigation being conducted by the U.S. Department of Homeland Security into Undercover A's criminal conduct.

All in violation of Title 18, United States Code, Section 1512(b)(1).

## COUNT FOUR
(Witness Tampering, 18 U.S.C. § 1512(b)(3))

45.     The Federal Grand Jury incorporates paragraphs 1-41 by reference.

46.     In or around October 2012, in the Western District of Oklahoma and elsewhere, defendant

---------------------------------DOUGLAS G. WILLIAMS-----------------------------------

did knowingly and corruptly persuade and attempt to persuade Undercover A to conceal material facts and make false statements with the intent to hinder, delay, and prevent the

communication to special agents of the U.S. Department of Homeland Security of information relating to the possible commission of a Federal offense.

All in violation of Title 18, United States Code, Section 1512(b)(3).

## COUNT FIVE
### (Witness Tampering, 18 U.S.C. § 1512(b)(1))

47.    The Federal Grand Jury incorporates paragraphs 1-41 by reference.

48.    In or around February 2013, in the Western District of Oklahoma and elsewhere, defendant

-----------------------------------DOUGLAS G. WILLIAMS----------------------------------

did knowingly and corruptly persuade and attempt to persuade Undercover B to conceal material facts and make false statements with the intent to influence, delay, and prevent the testimony of Undercover B in an official proceeding, that is, a pre-employment suitability determination and security background investigation conducted by U.S. Customs and Border Protection.

All in violation of Title 18, United States Code, Section 1512(b)(1).

## CRIMINAL FORFEITURE

49.    The allegations contained in Counts One through Five of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

50.    Pursuant to Rule 32.2(a), the defendant, **DOUGLAS G. WILLIAMS**, is

hereby notified that, upon conviction of the offenses in violation of Title 18, United States Code, Sections 1341, set forth in Counts One and Two, and upon conviction of the offenses in violation of Title 18, United States Code, Section 1512 set forth in Counts Three through Five, he shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

51.     If any of the property described above, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL:

*Virginia Hron*

FOREPERSON OF THE GRAND JURY

20

JACK SMITH
Chief, Public Integrity Section
United States Department of Justice

Mark Angehr
Brian Kidd
Trial Attorneys