IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA



FILED

FEB 2 1 2017

CARMELITA REEDER SHINN
CLERK, U.S. DISTRICT COURT
BY _____
         DEPUTY

UNITED STATES OF AMERICA
        Plaintiff,

v.                                          Case No. 5:14-cr-00318 - M

DOUGLAS G. WILLIAMS
        Defendant.

### REPLY TO GOVERNMENT'S OPPOSITION
### RE: MOTION FOR MODIFICATION OF
### TERMS OF SUPERVISED RELEASE

Now comes, Defendant Douglas G. Williams and files this reply to the Government's Response to his Motion for Modification of the Terms of Supervised Release. In support thereof Williams replies as follows:

1. First, there are numerous deficiencies in the Government's Opposition to the Modification Motion. First, the Government does not cite any law or cases from the Tenth Circuit. Instead the Government cites one case from the Third Circuit and two cases from the Eighth Circuit. The cases are not on point with the facts in Williams' case.

2. Second, the Government's statement that "...the restriction on polygraph related activities for the full term of supervised release is the minimum restriction necessary to protect the public." (Government Opposition p. 6). The government's statement is disingenuous. There are no factual findings by the Court to justify the broad condition that Williams be prohibited from participating "...in any form of polygraph related activity during the period of supervision.".

3. Third, and perhaps most important is the Government's failure to address the Tenth Circuit's decision in United States v Butler, 694 F. 3d 1177 (10th Cir. 2012). Here the Court stated a "... District's Court's duty to specifically find that a restriction is minimally restrictive is mandatory". The Government simply ignores the well established law in the Tenth Circuit. See United States v Bear, 769 f. 3d 1221 (10th Cir. 2014); United States v Butler 694 f. 3d 1177 (10th Cir. 2012); United States v Witling, 528 f. 3d 1280 (10th Cir. 2008).

4. The Government's reliance on the United States v Smith, 445 f. 3d 713 (3rd Cir. 2006) is wholly misplaced. The Smith case involved an order modifying the conditions of supervised release to account for new unforeseen circumstances. The Government sought a restriction forbidding Smith's employment with any entity where he would have access to the financial and personal information of current and future clients. The Court ruled against the Government finding that such a restriction was too broad. The Court narrowed the terms of supervised release to prohibit Smith from working in a law firm where he would have access to the financial records and the "... opportunity to fraudulently trade on his association with the attorneys to the detriment of others." (445 f. 3d 713 at 719).

5. The Government also relies on United States v Carlson, 406 F. 3d 529 (8th Cir. 2005) to support its facetious argument that the Court's special condition that Williams "... shall not participate in any form of polygraph related activity during the period of supervision is the minimum restriction... necessary to protect the public." In Carlson the court approved a special condition that prohibited the defendant from working as a physician's assistant because his work put him in close proximity to prescription pain medication. The Court noted that Carlson was an addict who had obtained drugs hundreds of times over the course of several years. The Court noted that Carlson's situation was different that the facts in United States v Choate, (101 f. 3d 562 1996) another case cited by the Government.

6. The Carlson case actually supports Williams' position. The Court stated:

"Carlson and the government cites United States v Cooper, 171 F. 3d 582 (8th Cir. 1999), and United States v Choate, 101 F. 3d 562 (8th Cir. 1996), respectively, to support their views of the occupational restriction imposed by the district court. In both Choate and Cooper, we reviewed for an abuse of the discretion a district court's imposition of an occupational restriction. Id. at 567; Cooper, 171 F. 3d at 585. Cooper involved a former Army explosives expert who transported government owned explosives from South Carolina to Iowa a placed them in a rented storage locker. 171 F 3d at 584. The activity went on undetected for several years until Cooper was arrested on unrelated charges. Id. Cooper plead guilty to unlawfully transporting explosives and the district court imposed a special condition prohibiting him "from employment as a truck driver if it involves absence from Cedar Rapids, IA, for more than 24 hours." Id. at 585. The condition effectively barred Cooper from his pre-detention occupation as an over-the-road trucker. Id. We found an abuse of discretion because "the occupational restriction (bore) no relationship to Cooper's offense of unlawfully transporting dangerous explosives to a storage locker many years ago." Id. at 586.

"(406 F. 3d 532) In Choate, the defendant pled guilty to two counts of wire fraud arising from a series of sham businesses that he had run. Choate, 101 F. 3d 562, 563-64. The district court imposed the special condition that Choate could not maintain self-employment during his supervised release. Id. at 566. We noted that "Choate has demonstrated that he is given to excesses of salesmanship that tend to creep up in business after business." Id. Because "the district court was not required to pit its imagination against Choate's to anticipate what sort of business he could put to fraudulent use," we concluded that "the prohibition on self-employment seemed a reasonable way to protect the public from Choate's practices and to channel Choate's energies into a less destructive path." Id.

"We find the instant case more akin to Choate than to Cooper. Carlson fraudulently obtained prescription medication hundreds of times over the course of several years. His occupation as an orthopedic physician's assistant placed him in close proximity to prescription medication, and he used sample medication obtained through is employment on at least two previous occasions. PSR at 2 P9. Although Carlson voluntarily sought impatient treatment for his addiction in 2001, he withdrew from the program against medical advice and was characterized as have a "very high" risk of relapse. Id. at 10 PP55-56. Given these facts, the district court did not abuse its discretion in prohibiting Carlson from working in the medical field during his term of supervised release."

7. Williams is a highly trained and experience polygraph operator. He has been working in his profession for over 44 years. The District Court has discretion to impose an occupational restriction as a special condition of supervised release, but its discretion must be exercised in accordance with 18 U.S.C. S3538 (d) Subsection (a) states that a sentencing court may impose an occupational restriction only if it determines that "... Imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted."

8. In this case there is no reason to believe that Williams will "continue to engage in unlawful conduct." Williams can practice his profession as a polygraph operator and continue to publish information about the ineffectiveness of the polygraph examination without engaging in a scheme to defraud the United States Government, or without tampering with a witness. Williams has a 1st Amendment right to provide information about how a person taking a polygraph test can avoid being falsely accused of deception simply because they have a nervous reaction to a relevant question. Williams has no intention of providing information or training to any person for the purpose of defrauding the government, or the tampering with a witness. In his business and occupation, Williams seeks to provide comprehensive information about the use of the polygraph examination as well as methods used by the subject being tested to prove their truthfulness on a polygraph examination.

9. Any occupational restriction must be "reasonably necessary to protect the public" which requires a finding by the Court that, in the absence of the restriction "the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. 5F1.5 (a)(2). In providing information about the use of the polygraph examination as well as methods to produce a "truthful" polygraph chart tracing, Williams is actually protecting the public and individual citizens from being defrauded by government agencies or employees who improperly use the polygraph testing process, and falsely brand a truthful person as a liar simply because they are nervous.

10. The government's response states: "Given the defendant's (Mr. Williams) extreme disregard for public safety and national security, there are no less restrictive alternatives that would adequately prevent him from helping individuals lie in order to obtain or keep sensitive government positions." Williams would submit that he is more concerned with our national security as evidenced by the fact that he has devoted almost forty years of his life proving the polygraph is nothing but a scam and he has been warning the government that it is foolish and dangerous to rely in the polygraph as a "lie detector". In truth and in fact, it is the polygraph operators and those government officials who rely on the polygraph who are the ones who have demonstrated little regard for public safety and national security by relying on such an unreliable procedure as polygraph testing. Further, there is no evidence that Williams has ever been involved in "helping individuals lie in order to obtain or keep sensitive government positions". In fact, the government seized Mr. Williams' computer and downloaded the records of over 4900 people who had either purchased his manual and DVD or took part in my one on one polygraph test preparation training. The government agents, and an AUSA interviewed every one of these people who were of interest to them. They started the interview by saying, "We're not after you, we are after Doug Williams.". They interrogated them very intensely asking them if Williams ever told them to lie or if they ever told Williams they were going to lie. Not one of these people ever said Williams told them to lie or that they ever told Williams they were going to lie. It is of interest to note that polygraph operators from this same agency, the Customs and Border Patrol, admit that over two-thirds of the applicants for positions with that agency are denied employment because of a "failed" polygraph test so it is obvious that many thousands of people have been falsely accused of deception by government polygraph operators. This failure rate is another example of the polygraph program's extreme disregard for public safety and national security by thwarting the Customs and Border Patrol's efforts to adequately staff their agency.

11. The government's response states: "Both UCs made it clear to defendant (Mr. Williams) that they could not keep or obtain federal employment unless he helped them lie about their crimes during their respective polygraph examinations. Knowing the UCs intent to lie to federal investigators in order to get or keep federal law enforcement positions, defendant (Mr. Williams) willingly trained them how to provide false responses to polygraphers questions and still pass." That is not true, neither of the UCs told Mr. Williams they were going to lie on the polygraph test, nor did Mr. Williams ever tell them to lie. The first undercover agent simply said the investigators already knew he had "turned his head" while a friend brought in some drugs and the second undercover agent said he was going to tell the polygraph operator about his "crimes" and his only concern was that it would get back to the sheriff and he would lose his job as a deputy. Also, the government has no evidence that Mr. Williams "trained them to provide false responses to polygraphers questions and still pass". The fact is that no polygraph test was ever administered to either of these undercover agents, nor did they ever intend to take a polygraph test. And there is no evidence that Mr. Williams helped them "lie about their crimes during their respective polygraph examinations" when no such test was ever taken. The UCs were the ones doing all the lying and they needed no help from Mr. Williams. Indeed, this was all pretend and they were even lying about lying since everything they said was scripted.

12. The polygraph is a simple device that has not changed significantly since in was invented in 1920. It records the subject's blood pressure, pulse rate, respiration and what's known as the galvanic skin response which is basically just a measurement of the increase or decrease of sweat activity on the subject's fingers. Polygraph operators ask a series of questions during the test and measure the subject's reaction or lack of reaction to the questions. There are two types of questions asked on the polygraph test - relevant and control. The relevant questions are those that pertain to the point at issue. For example, if the polygraph test is about drug smuggling, the questions would be as follows: Did you smuggle drugs into the country? Did you work with someone to smuggle drugs into the country? Right now could you take me to any of the drugs that were smuggled into the country? The polygraph operator will intersperse control questions during the test. The control questions would be as follows: Have you ever lied to anyone in authority to keep from getting in trouble? Did you ever deliberately hurt anyone? Have you ever stolen anything? The theory underlying the polygraph as a "lie detector" is as follows: If a subject has a reaction on a relevant questions that is greater than their reaction to a control questions, the subject is deemed to be deceptive. If the reverse is true, and the subject has a reaction to the control questions that is greater than their reaction to the relevant questions, the subject is deemed to be truthful. This reaction that would brand a person as a liar is simply a nervous reaction such as is seen in the fight or flight response. When a person is confronted with a threatening stimulus their body releases a shot of adrenalin which causes their blood pressure to increase, their breathing to become erratic, and the sweat activity on their hand to increase. In order for the polygraph to be accurate as a "lie detector", this reaction that polygraph operators refer to as a "lying reaction" or a "reaction indicative of deception" must always indicate deception. The problem is that there is no such thing as a "lying reaction". In fact, the reaction that brands a person as a liar can and often is caused by any number of innocent stimuli - such as embarrassment, rage at having been asked an accusatory question, simple nervousness, fear of being falsely accused of lying - even the tone of the examiner during questioning can elicit a reaction that would cause a person to fail the test. So, the polygraph records a person's nervous reaction to relevant questions but the problem is that nervousness does not always indicate deception - in fact it only indicates deception about 50% of the time. Thus the polygraph is no more accurate than "the toss of a coin". Mr. Williams simply teaches people what the polygraph records, teaches them the difference between the relevant and control questions and runs them through a relaxation exercise similar to that used in the Lamas technique of natural child birth. This training only takes about twenty minutes and then the subject is hooked up to the polygraph and is allowed to demonstrate their ability to relax when answering the relevant questions and think of something frightening when answering the control questions thereby producing a perfect "truthful" chart. When you consider the extraordinary failure rate of almost 70% at the Customs and Border Patrol - as well as other government agencies - it is logical to assume that many thousands of people are falsely branded as liars by government polygraph operators. It would be unconscionable to deprive those persons seeking this training from receiving it by prohibiting Mr. Williams from continuing to educate them about how to avoid being falsely accused of deception simply because they are nervous.

13. The government's response states: "Because defendant's criminal conduct was inextricably linked with his polygraph business and because defendant has repeatedly and deliberately sought to avoid knowledge of his clients intention to lie during polygraph examinations (in order to insulate himself from criminal activity), the Court's restriction on defendants participation in polygraph related activity is necessary to protect the public." There is no statute that prohibits Mr. Williams from teaching a person to pass, or for that matter to "beat" a polygraph test. Williams was charged with witness tampering and Mr. Williams' knowledge or lack of knowledge about his clients intention to lie during polygraph examinations is irrelevant simply because having the knowledge that a person he is training plans to lie does not constitute a crime. The crime Mr. Williams was charged with is witness tampering not teaching a person how to pass a polygraph test. Further, as will be discussed later, except in these two cases, there is no evidence that any one has ever told him they intended to lie during polygraph examinations, and Mr. Williams has certainly never told anyone to lie on their polygraph examinations - and in fact Mr. Williams never told any of these undercover agents to lie - nor did they ever tell Mr. Williams they planned to lie on their polygraph examinations. As regards the charges of witness tampering, it appears from the record that the only "tampering" being done was done by the government's undercover agents. And it should be noted that these agents were not "witnesses" to anything. In fact everything they said was a lie. Also, everything Mr. Williams told the government's undercover agents about how to pass a polygraph test was in his testimony to the congress in 1985 in support of the Employee Polygraph Protection Act. So Mr. Williams is in prison for telling the undercover agents exactly what he told the congress over thirty years ago.

14. Williams has been demonstrating how simple it is to "beat the box" on national television and in hundreds of seminars over the past thirty eight years. It is true that anyone can use Mr. Williams' techniques to pass their polygraph test regardless of whether they are nervous or not, lying or not, no matter what. Mr. Williams has been saying that for almost forty years. He says that is hopes that those who use the polygraph or rely on the results reported to them by polygraph operators will realize that it is not accurate or reliable as a "lie detector" and will quit using it. Besides, liars can pass the polygraph test easily regardless of whether they have been trained or not. History is replete with examples of people who have lied and passed polygraph tests with no problem, Aldridge Ames, the CIA agent who was a notorious traitor, passed many polygraph examinations - and he was actively passing classified information to the Soviets when he took - and passed - many polygraph tests. As a matter of fact, there has never been even one traitor, or spy ever caught by the polygraph. Even the most recent episode with Edward Snowden demonstrates how foolish and dangerous it is to rely on the results of a polygraph test. Snowden passed two polygraph tests in order to get access to the information he leaked from the NSA. Snowden not only passed the pre-employment polygraph test, but he also passed the all encompassing, highly vaunted "lifestyle" polygraph test. Snowden passed both polygraph tests, even though he knew at the time he took the tests what he planned to do when he got his security clearance. If that doesn't prove the polygraph is worthless, what does? So, the polygraph brands truthful people as liars and allows liars to pass the test with no problem. In fact, liars have demonstrated the ability to pass the polygraph test without any training whatsoever while truthful people are branded as liars at an alarming rate. Therefore, Williams' training is essential to help truthful people avoid being falsely accused of deception. Accordingly Williams requests that the Court remove the special condition of his supervised release prohibiting his participation in any form of polygraph related activity.

Respectfully submitted _[signature]_
Douglas G Williams
Pro Se

Certificate of Service

I mailed a copy of this motion to:
U.S. Attorney's Office
200 NW 4th St.
Oklahoma City, OK
73102

_[signature]_
Douglas G. Williams